# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## ROCK HILL DIVISION

| | |
|---|---|
| DAVE HOWES, Derivatively on Behalf of 3D SYSTEMS CORPORATION,<br><br>       Plaintiff,<br><br>   v.<br><br>ABRAHAM N. REICHENTAL, DAMON J. GREGOIRE, CHARLES W. HULL, THEODORE A. HULL, WILLIAM E. CURRAN, PETER H. DIAMANDIS, WILLIAM D. HUMES, JIM D. KEVER, G. WALTER LOEWENBAUM, KEVIN S. MOORE, DANIEL S. VAN RIPER, and KAREN E. WELKE,<br><br>       Defendants,<br><br>   -and-<br><br>3D SYSTEMS CORPORATION, a Delaware corporation,<br><br>       Nominal Defendant. | Civil Action No.   0:16-2810-MGL<br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Dave Howes ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant 3D Systems Corporation ("3D Systems" or the "Company") against certain current and/or former officers and directors of the Company for violations of law, including breaches of fiduciary duties, insider selling and misappropriation of information, unjust enrichment, and corporate waste, from at least October 29, 2013 to the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by 3D Systems and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on 3D Systems' website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *KBC Asset Management NV v. 3D Systems Corporation, et al.*, Civil Action No. 0:15-cv-02393-MGL (the "Securities Class Action"); and (e) review of other publicly available information concerning 3D Systems and the Individual Defendants (defined below).

## I.    NATURE AND SUMMARY OF THE ACTION

1.      3D Systems is a holding company that, through its subsidiaries, engineers, manufactures, and sells three-dimensional ("3D") printing products and services. The Company's headquarters are in Rock Hill, South Carolina.

2.      The Company was founded by defendant Charles "Chuck" Hull ("Chuck Hull"), the inventor and patent-holder of the first 3D printing system. For several years after its

founding, the Company faced little competition and was able to dominate the 3D printing market.

3.   As the 3D printing industry developed, competitors began to emerge that challenged the Company's market dominance.

4.   In 2001, 3D Systems began an acquisitions program that sought to consolidate the 3D printing industry under the Company's umbrella. The Company grew quickly, and by 2008 was completing mergers with other companies at a rapid rate, including 16 mergers in 2011. Between 2008 and 2015, the Company made approximately 40 acquisitions.

5.   During the Relevant Period, the Individual Defendants caused 3D Systems to issue false and misleading statements regarding the Company's operations and business practices, and misleadingly indicated that sales would continue to grow.

6.   For example, on February 28, 2014, the Individual Defendants caused 3D Systems to issue a press release announcing financial results for the fourth quarter and full year 2013. In the press release, defendant Abraham "Avi" Reichental ("Reichental"), the Company's President and Chief Executive Officer ("CEO"), proclaimed that the Company was "planning to double our revenue over the next couple of years" and stated: [1]

> We are pleased to report *another record revenue quarter on robust professional and advanced manufacturing printers' demand*, increased materials' growth rate and *total unit sales that more than tripled last year's units*.

7.   As a result of the false and misleading statements, the Company's stock price rose dramatically, reaching artificially inflated prices as high as $96.42 during the Relevant Period.

---

[1] All emphasis is added unless otherwise noted.

8.     While the stock price was artificially inflated, certain Individual Defendants took advantage of their knowledge of material, adverse, and non-public information regarding the Company's operations, and sold their shares for many millions of dollars in profits.

9.     Taking further advantage of the artificially inflated stock price, the Individual Defendants also caused the Company to offer 5,950,000 shares to the public on May 29, 2014, for profits of almost $300 million.

10.     In July 2014, the truth about the Individual Defendants' misleading statements regarding the Company's sales growth and prospects began to emerge. On that date, the Individual Defendants caused the Company to issue a press release announcing the Company's second quarter 2014 financial results, revealing that the Company's quarterly revenues were only $151.5 million, far short of the expected revenues of $162.3 million. Further, the Company's growth was only 10%, compared with 30% in prior quarters.

11.     The market reacted to this revelation with an 11% drop in the Company's stock price in one day, falling $5.94 per share to close at $50.13 on July 31, 2014, resulting in a loss of approximately $653 million dollars in market capitalization.

12.     The Individual Defendants attempted to downplay the financial results and continued to falsely reassure investors that the Company's prospects for growth were secure. In a press release on July 31, 2014, defendant Reichental stated that "the fundamentals of our business are intact and our gross profit margins are poised to rebound and resume their expansion trajectory. . . ."

13.     The Company's stock price continued to decline, but remained at artificially inflated prices due to the Individual Defendants' ongoing false and misleading statements.

14.     But on October 22, 2014, the Individual Defendants caused the Company to

issue a press release announcing preliminary financial results for the third quarter 2014. In the press release, the Individual Defendants finally conceded that "[s]trengthening sales . . . were not enough to overcome the revenue shortfall from the continued manufacturing capacity constraints . . . ."

15. On this news, the price of 3D Systems stock sank another 15% in one day, declining $6.71 per share to close at $36.67 on October 22, 2014, erasing another $737.5 million in market capitalization.

16. Moreover, the Individual Defendants' announcement revealed that, contrary to their initial assurances, the weaknesses in the Company's operations continued and that, during the Relevant Period, projected growth figures had been artificially inflated as a result of 3D Systems' lack of adequate internal controls.

17. All told, 3D Systems saw its market capitalization shrink by **billions of dollars** during the Relevant Period between January 2014 and October 2014. The Company's stock price has continued its downward trajectory, closing at just $15.69 per share on August 10, 2016.

18. Of course, not everyone was harmed by the Individual Defendants' actions. Specifically, during the Relevant Period, certain of the Individual Defendants **sold at least 567,000 shares of 3D Systems stock at inflated prices reaping over $33 million in proceeds.**

19. The 3D Systems Board of Directors (the "Board") has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims, because, among other things, a majority of the members of the Board are directly interested in the personal financial benefits challenged herein, that were not shared with 3D Systems shareholders, and/or face a substantial likelihood of liability to 3D Systems for breaching their fiduciary duties of loyalty and good faith by authorizing or

failing to correct the false and misleading statements alleged herein, and/or lack independence. Accordingly, a pre-suit demand upon the Board was and is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to 3D Systems.

## II.  JURISDICTION AND VENUE

20.  Jurisdiction is proper under 28 U.S.C. § 1332. Complete diversity exists between Plaintiff and defendants. Further, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.  Venue is proper in this district under 28 U.S.C. § 1391 because: (a) 3D Systems maintains its principal executive offices in this district; (b) one or more of the Defendants reside(s) in this district; (c) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts— occurred in this district; and (d) the Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

22.  In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III.  THE PARTIES

23.  Plaintiff Howes is a current shareholder of 3D Systems stock and has continuously held shares of 3D Systems stock since January 2013. Plaintiff resides in Ontario, Canada.

24.     Nominal Defendant 3D Systems is a Delaware corporation with principal executive offices located in Rock Hill, South Carolina. 3D Systems is a holding company that manufactures and sells 3D printing products and services. The Company's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "DDD." As of July 27, 2016, the Company has approximately 112 million shares outstanding.

25.     Defendant Reichental was the Company's President and CEO from September 2003 until October 28, 2015. Defendant Reichental is a defendant in the Securities Class Action. During the Relevant Period, while in possession of material, adverse, non-public information, Reichental disposed of at least 144,000 shares of his personally-held 3D Systems common stock for *proceeds of approximately $8.8 million* at artificially inflated prices. Reichental received $10,898,483 in total compensation from 3D Systems in 2013, $6,640,675 in total compensation from 3D Systems in 2014, and $1,028,432 in total compensation from 3D Systems in 2015. Reichental is a citizen of California.

26.     Defendant Damon J. Gregoire ("Gregoire") was the Company's Chief Financial Officer ("CFO") from April 2007 to November 11, 2014, when he became the Company's Executive Vice President of Mergers and Acquisitions. Until November 2014, he was also the Company's Senior Vice President and Principal Accounting Officer. Gregoire is a defendant in the Securities Class Action. During the Relevant Period, while in possession of material, adverse, non-public information, Gregoire disposed of at least 162,500 shares of his personally-held 3D Systems common stock for *proceeds of approximately $8.9 million* at artificially inflated prices. Gregoire received $5,243,276 in total compensation from 3D Systems in 2013, and $557,004 in total compensation from 3D Systems in 2014. Gregoire is a citizen of South Carolina.

27. Defendant Chuck Hull is the founder of 3D Systems, has been an Executive Vice President of the Company since 2000, Chief Technology Officer since 1997, and a director since 1993. The Company has entered into a consulting arrangement with Chuck Hull which will take effect at the time of his retirement from 3D Systems, pursuant to which the Company will pay him a compensation package totaling $695,153, including a consulting fee paid over four years in a total amount of $525,000, and continuing coverage for life, dental, vision, and health insurance. During the Relevant Period, while in possession of material, adverse, non-public information, Chuck Hull disposed of at least 95,000 shares of his personally-held 3D Systems common stock for *proceeds of almost $3.8 million* at artificially inflated prices. Chuck Hull received $2,803,363 in total compensation from 3D Systems in 2013, $1,882,504 in total compensation from 3D Systems in 2014, and $974,087 in total compensation from 3D Systems in 2015. Chuck Hull is a citizen of California.

28. Defendant Theodore "Ted" Hull ("Ted Hull") was the Company's CFO from November 11, 2014 until May 15, 2015. Ted Hull is a defendant in the Securities Class Action. Ted Hull received $2,291,827 in total compensation from 3D Systems in 2014, and $547,483 in total compensation from 3D Systems in 2015. In addition, on his departure, 3D Systems entered into a separation agreement with Ted Hull, providing him with an amount of up to $400,000 (equal to one year of his previous salary), as well as medical coverage for Mr. Hull and his dependents and relocation assistance (not to exceed a total of approximately $200,000). 3D Systems also agreed to indemnify Ted Hull for a period of three years after separation for any claim arising from his performance as an officer, director or employee of the Company. Ted Hull is a citizen of North Carolina.

29. Defendant William E. Curran ("Curran") has been a director of the Company since 2008. During the Relevant Period, Curran served as a member of the Audit Committee. Curran received $223,207 in total compensation from 3D Systems in 2013, $217,996 in total compensation from 3D Systems in 2014, and $202,077 in total compensation from 3D Systems in 2015. Curran is a citizen of New York.

30. Defendant Peter Diamandis ("Diamandis") was a director of the Company from 2013 until the 2016 annual shareholder meeting, which took place on May 17, 2016. Diamandis received $138,732 in total compensation from 3D Systems in 2013, $168,746 in total compensation from 3D Systems in 2014, and $142,577 in total compensation from 3D Systems in 2015. Diamandis is a citizen of California.

31. Defendant William Humes ("Humes") has been a director of the Company since 2014. Humes received $196,911 in total compensation from 3D Systems in 2014, and $156,760 in total compensation from 3D Systems in 2015. Humes is a citizen of California.

32. Defendant Jim D. Kever ("Kever") has been a director of the Company since 1996. Kever received $162,707 in total compensation from 3D Systems in 2013, $172,087 in total compensation from 3D Systems in 2014, and $147,077 in total compensation from 3D Systems in 2015. Kever is a citizen of Tennessee.

33. Defendant G. Walter Loewenbaum ("Loewenbaum") has been a director of the Company since 1999. During the Relevant Period, while in possession of material, adverse, non-public information, Loewenbaum disposed of at least 151,479 shares of his personally-held 3D Systems common stock for ***proceeds of approximately $11.2 million*** at artificially inflated prices. Loewenbaum received $279,957 in total compensation from 3D Systems in 2013,

$279,996 in total compensation from 3D Systems in 2014, and $367,827 in total compensation from 3D Systems in 2015. Loewenbaum is a citizen Montana.

34.     Defendant Kevin S. Moore ("Moore") has been a director of the Company since 1999.  During the Relevant Period, Moore served as a member of the Audit Committee.  During the Relevant Period, while in possession of material, adverse, non-public information, Moore disposed of at least 15,000 shares of his personally-held 3D Systems common stock for *proceeds of over $1.0 million* at artificially inflated prices.   Moore received $208,207 in total compensation from 3D Systems in 2013, $205,246 in total compensation from 3D Systems in 2014, and $192,827 in total compensation from 3D Systems in 2015.  Moore is a citizen of Connecticut.

35.     Defendant Daniel S. Van Riper ("Van Riper") has been a director of the Company since 2004.  During the Relevant Period, Van Riper served as a member of the Audit Committee. Van Riper received $200,207 in total compensation from 3D Systems in 2013, $199,496 in total compensation from 3D Systems in 2014, and $183,577 in total compensation from 3D Systems in 2015.  Van Riper is a citizen of Florida.

36.     Defendant Karen Welke ("Welke") has been a director of the Company since 2008.  Welke received $179,957 in total compensation from 3D Systems in 2013, $187,746 in total compensation from 3D Systems in 2014, and $162,827 in total compensation from 3D Systems in 2015.  Welke is a citizen of New Jersey.

37.     Defendants identified in ¶¶25-36 are sometimes referred to herein as the "Individual Defendants."

38.     Defendants identified in ¶¶27, 29, 31-36 are sometimes referred to herein as the "Director Defendants."

39. Defendants identified in ¶¶29, 34, and 35 are sometimes referred to herein as the "Audit Committee Defendants."

40. Defendants identified in ¶¶25-27, 33, and 34 are sometimes referred to herein as the "Insider Selling Defendants."

41. As directors and/or officers of 3D Systems, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known the adverse, non-public information about the Company's business, operations, prospects, internal controls, and financials, including the Company's acquisition strategy, manufacturing capacity, product quality, sales and revenue growth projections, inventory control, and booking and shipping practices, because of their access to internal corporate documents, conversations and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith. The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon 3D Systems through, *inter alia*, the issuance of the improper statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and 3D Systems stockholders.

## IV.    FACTUAL ALLEGATIONS

### A.    Company Background

42. 3D Systems is a holding company with headquarters in Rock Hill, South Carolina. Through its subsidiaries, the Company engineers, manufactures, and sells 3D printing products and services.

43. 3D Systems was founded by defendant Chuck Hull, who invented and patented stereolithography, the first 3D printing system. As opposed to traditional manufacturing, which

relies on a subtractive process to produce an object out of a larger block of material, 3D printers use an additive manufacturing process in which successive layers of material are applied to build solid objects.

44. The Company now produces a variety of printers that are available in various configurations and use a wide range of materials such as plastics, metals, ceramics, and edibles. 3D Systems markets small printers to consumers for home, office, and classroom use, and markets larger "direct metal" printers to business customers for industrial use. The Company's printers can print medical devices, aerospace and automotive parts, personalized accessories and jewelry, toys, art, and many other items.

45. The Company primarily sells its products through authorized resellers.

**B.** **The Individual Defendants Pursue an Aggressive Growth Strategy for 3D Systems**

46. For several years after its founding, the Company faced little competition and developed a position as the major player in the 3D printing market.

47. But as the 3D printing industry matured, competitors began to emerge that challenged the Company's market dominance. In response, 3D Systems began an ambitious acquisitions program that sought to consolidate the entire 3D printing industry under the Company's umbrella.

48. The acquisitions program resulted in a large number of mergers at a rapid pace. Between May 2011 and October 2012, the Company bought and merged with 16 companies. As one commentator noted at the time: "Even the best management team is going to have a task in front of them when acquiring that many companies in such a short amount of time."

49. Between 2008 and 2015, the Company made over 40 acquisitions, including companies in the United States, Mexico, South America, Europe, and Asia.

50.     As the Company's growth by acquisitions continued, defendant Reichental stated in July 2013 that interest in 3D Systems was "unprecedented" and that R&D spending would be increased due to "heavy demand" for the Company's printing products and services.

51.     During the Relevant Period, the Individual Defendants caused 3D Systems to issue statements suggesting that the Company's growth strategy would lead to significant revenue growth without any downside.   The Individual Defendants concealed the reality that the Company's acquisition strategy was affecting its manufacturing capacity and product quality, and that inadequate internal controls and improper booking and shipping practices were leading to problems with inventory control.   These problems, as the Individual Defendants were well aware, would affect sales and revenue growth projections, making the Company's public statements false and misleading.

## V.     THE INDIVIDUAL DEFENDANTS CAUSED 3D SYSTEMS TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

52.     Throughout the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to the Individual Defendants and/or recklessly disregarded by them.   Specifically, the Individual Defendants knew but failed to disclose, or recklessly disregarded, that 3D Systems' sales and revenue growth projections were inflated, and that the Company's acquisition strategy was affecting its manufacturing capacity and product quality, and that the Company lacked adequate internal controls.

**A. The Individual Defendants Cause the Company to Make Improper Statements in Connection with the Announcement of the Company's 2013 Third Quarter Results**

53.     On October 29, 2013, the Individual Defendants caused the Company to announce third quarter 2013 financial results.  On that date, the Individual Defendants caused 3D Systems to file with the SEC a Form 8-K attaching both a press release and a summary of results in advance of a conference call with analysts to discuss the Company's financial results.

54.     3D Systems' October 29, 2013 press release stated in relevant part:

ROCK HILL, South Carolina – October 29, 2013 – 3D Systems Corporation (NYSE: DDD) announced today that its third quarter revenue grew 50% from the prior year to a record $135.7 million on a 76% increase in printers' and other products revenue and 30% overall organic growth, resulting in GAAP earnings of $0.17 per share and non-GAAP earnings of $0.26 per share.

Gross profit increased 52% and gross profit margin expanded 80 basis points to 52.6%, contributing to GAAP net income of $17.7 million, and non-GAAP net income of $26.2 million, representing a 44% improvement over the 2012 quarter.

For the nine months 2013, revenue grew 42% to $358.6 million, on an 81% increase in printers and other products revenue and 27% organic growth, resulting in GAAP earnings of $0.34 per share and non-GAAP earnings of $0.66 per share. Gross profit increased 46% and gross profit margin expanded 120 basis points to 52.3%.

**Third Quarter 2013 Revenue Highlights** (compared to 2012 quarter):

- 3D printers and other products revenue increased 76% to $59.8 million.
- Print materials revenue grew 30% to $33.2 million.
- Services revenue rose 38% to $42.7 million.
- Healthcare revenue grew 39% and contributed $16.9 million to our total revenue.
- Consumer solutions contributed $13.5 million to our total revenue.

55.     The press release touted the Company's increased manufacturing capacity, and described 3D Systems as well positioned to meet increasing customer demand, stating: "For the third quarter in a row, the Company expanded its manufacturing capacity to accommodate increasing demand for its products and services."  Defendant Reichental also confirmed that

3D Systems was focusing on an accelerated growth strategy based on new acquisitions and new products, which would improve the Company's results in future quarters.

56. On the same day, the Individual Defendants caused the Company to file Form 10-Q with the SEC reporting the Company's financial results for the third quarter ending September 30, 2013. The Form 10-Q stated that 3D Systems "completed four acquisitions in the third quarter of 2013. . . [d]uring the previous quarters of 2013, the Company completed three acquisitions which aggregated to a purchase price of $97,449." The Form 10-Q also confirmed the results reported in the October 29, 2013 press release, and stated:

> At September 30, 2013 our backlog was $14.4 million, compared to backlogs of $11.4 million at December 31, 2012 and $9.3 million at September 30, 2012. Production and delivery of our printers is generally not characterized by long lead times, backlog is more dependent on timing of customers requested delivery. In addition, Quickparts services lead time and backlog depends on whether orders are for rapid prototyping or longer-range production runs. The backlog at September 30, 2013 includes $8.7 million of Quickparts services orders, compared to $5.5 million at September 30, 2012.
>
> In addition to changes in sales volumes, including the impact of revenue from acquisitions, there are two other primary drivers of changes in revenues from one period to another: the combined effect of changes in product mix and average selling prices, sometimes referred to as price and mix effects, and the impact of fluctuations in foreign currencies.
>
> As used in this Management's Discussion and Analysis, the price and mix effects relate to changes in revenue that are not able to be specifically related to changes in unit volume. Among these changes are changes in the product mix of our materials and our printers as the trend toward smaller, lower-priced printers has continued and the influence of new printers and print materials on our operating results has grown.

57. Defendants Reichental and Gregoire signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating they had reviewed the Form 10-Q and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" that report.

58.     Also on the same date, the Individual Defendants hosted a conference call with securities analysts to discuss the Company's financial results.  In his opening remarks on the call, Defendant Reichental boasted of "record revenue for both the quarter and the year" and strong demand by consumers, which the Company planned to meet with increased production:

> Putting all the pieces together, we are convinced that this is a unique moment for our business. The level of inbound interest is at an all-time high across both the advanced manufacturing and consumer sectors. Specifically, *we sold out our current direct metal printers manufacturing capacity and decided to triple our manufacturing capacity over the next 12 months*, as well as accelerate the development of additional direct metal 3D printer models.

59.     These statements were false and misleading when made because (a) the Company's aggressive acquisition strategy acquisition strategy was affecting its manufacturing capacity; (b) the Company lacked reliable internal controls; (c) improper booking and shipping practices were leading to problems with inventory control; and (d) these issues would affect the Company's stated sales and revenue growth projections.

**B.      The Individual Defendants Cause the Company to Make Improper Statements in Connection with the Announcement of the Company's 2013 Fourth Quarter and 2013 Full Year Results**

60.     On February 28, 2014, the Individual Defendants caused the Company to announce fourth quarter and full year 2013 financial results.   On that date, the Individual Defendants caused 3D Systems to file with the SEC a Form 8-K attaching both a press release and a summary of results in advance of a conference call with analysts to discuss the Company's financial results.

61.     The February 28, 2014 press release stated in part:

ROCK HILL, S.C., Feb. 28, 2014 (GLOBE NEWSWIRE) -- 3D Systems Corporation (NYSE:DDD) announced today that its fourth quarter revenue grew 52% from the prior year to a record $154.8 million on 34% overall organic growth, resulting in GAAP earnings of $0.11 per share and non-GAAP earnings of $0.19 per share for the fourth quarter.

For the fourth quarter 2013, gross profit increased 53% and gross profit margin remained flat at 51.7% compared to the 2012 fourth quarter, and contributed to GAAP net income of $11.2 million, and non-GAAP net income of $19.7 million.

For the full year 2013, revenue increased 45% to a record $513.4 million on 80% printers and other products growth and 29% organic growth, resulting in GAAP earnings of $0.45 per share and non-GAAP earnings of $0.85 per share for the year. Gross profit increased 48% and gross profit margin expanded 90 basis points to 52.1%.

"We are pleased to report another record revenue quarter on robust professional and advanced manufacturing printers' demand, increased materials' growth rate and total unit sales that more than tripled last year's units," said Avi Reichental, 3D Systems' President and Chief Executive Officer.

**Fourth Quarter 2013 Revenue Highlights** (compared to 2012 quarter)**:**

- 3D printers and other products revenue increased 76% to $73.9 million.
- Print materials revenue grew 39% to $37.2 million.
- Services revenue rose 33% to $43.7 million.
- Healthcare revenue increased 67% to $21.8 million.
- Consumer solutions expanded 162% to $8.9 million.

**Full Year 2013 Revenue Highlights** (compared to 2012)**:**

- 3D printers and other products revenue increased 80% to $227.6 million.
- Print materials revenue grew 24% to $128.4 million.
- Services revenue rose 27% to $157.4 million.
- Healthcare revenue increased 45% to $71.7 million.
- Consumer solutions expanded 206% to $34.8 million.

"Compared to our late quarter expectations, we are disappointed that our stronger order book didn't convert to higher revenue, but instead, resulted in a near doubling of last quarter's backlog. Despite our higher growth, certain revenue categories fell short of our expectations and the concentration of new product announcements deferred sales and suppressed expected gross profit margin for the quarter," continued Reichental.

Consistent with its prior comments, the company more than doubled its fourth quarter R&D spending from $7.8 million the prior year to $16.6 million for the December quarter and continued to rapidly increase its sales, marketing, infrastructure and talent expenditures in support of its growth initiatives and recently announced joint developments and alliances. The impact of these expenditures was partially reflected in the unveiling of 24 new products between December 1st 2013 and January 9th 2014. The company also continued to expand its manufacturing capacity to accommodate increasing demand.

"Maintaining our historical performance doesn't require this level of increased expenditures, but planning to double our revenue over the next couple of years does," said Reichental. Although, in October, we guided for reduced earnings to reflect these actions, our late-quarter expenditures ramp surpassed our expectations."

Management continues to focus on accelerating the company's growth and expanding its market share. Consequently, management is prioritizing initiatives and investments that are central to its plans to double its revenue, over the next couple of years, ahead of short-term earnings, in order to deliver the full potential of its business model. Accordingly, management expects 2014 revenue to be in range of $680 million to $720 million and expects GAAP earnings per share in the range of $0.44 to $0.56 and non-GAAP earnings per share to be in the range of $0.73 to $0.85.

"We believe that 3D Printing is at the cusp of accelerated growth and that the ultimate measure of our success will be the sustainable value we create from our share and scale gains over time. While our stepped up actions and investments pressured our quarterly earnings, we believe that our actions set the stage to substantially compress the time it will take us to extend and solidify our leadership position and deliver greater value," concluded Reichental.

62.     On the same day, the Individual Defendants caused the Company to file Form 10-K with the SEC reporting the Company's financial results for the fourth quarter and full year ending December 31, 2013.   The Form 10-K confirmed the results reported in the February 28, 2014 press release, and stated:

We are continuing to expand our global facilities and increase manufacturing capacity to meet demand for our products and services. In October, we announced that we plan to expand our Rock Hill, SC, manufacturing operations, which we expect to generate approximately 145 new jobs. We are also expanding manufacturing capacity in our other facilities for printers, including at least tripling our direct metals printers' production output.

63.     Defendants Reichental and Gregoire signed certifications pursuant to SOX stating they had reviewed the Form 10-K and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period

covered by" that report. The Form 10-K was also signed by Individual Defendants Reichental, Gregoire, Chuck Hull, Curran, Diamandis, Kever, Loewenbaum, Moore, Van Riper, and Welke.

64.     Also on the same date, the Individual Defendants hosted a conference call with securities analysts to discuss the Company's financial results. In his opening remarks on the call, Defendant Reichental stated:

> Unfavorable mix and extraordinarily high concentration of new product announcements also deferred some sales and helped suppress our expected gross profit margin. As a result, gross profit margin remained flat from the prior year's quarter at 51.7% and our operating expenses also exceeded our expectations and Damon will cover that in more detail shortly. For the year, revenue grew 45% to a record $513.4 million on an 80% revenue increase in printers and other products and a 29% organic growth. Gross profit margin expanded 90 basis points to 52.1% despite unfavorable mix.

> All of our revenue categories contributed to record sales for the quarter, but 3D Printers and other products outpaced all other categories growing 76% to $73.9 million, primarily as a result of strengthening demand for our design and manufacturing printers. Our materials revenue growth rates accelerated to 39% and contributed some $37.2 million revenue for the quarter and our healthcare solutions revenue grew 67% for the quarter and contributed $21.8 million for our total revenue.

65.     Also during the conference call, Defendant Gregoire stated:

> The number of unprecedented opportunities in front of us convinced us that now is the time to take bolder steps like acquiring Xerox Wilsonville team, bold investments, such as this has brought us over hundred experienced engineers, including over 20 materials scientists, state-of-the-art facilities and significant IP access, which are meant to catapult us years ahead of the pack and to position us to accelerate our organic growth and set the stage for doubling our revenue over the next two years. With higher revenue, we also expect our gross profit margin to continue to expand starting as early of the second half of 2014 and then reach levels of 55% to 60% as we get into the $750 million to $1 billion revenue run rate.

> During the next couple of years, we expect sales and marketing expenses to rise incrementally with revenue and our R&D expenses to hover around 8% of revenue as we fully absorb the Xerox acquisition and execute on our partnerships and alliances and continue innovative new product development. Even with our increased level of discretionary investments, we expect our operating leverage to resume in 2015.

66.     These statements were false and misleading when made because (a) the Company's aggressive acquisition strategy acquisition strategy was affecting its manufacturing capacity; (b) the Company lacked reliable internal controls; (c) improper booking and shipping practices were leading to problems with inventory control; and (d) these issues would affect the Company's stated sales and revenue growth projections.

## C.     The Individual Defendants Cause the Company to Make Improper Statements in Connection with the Announcement of the Company's 2014 First Quarter Results

67.     On April 29, 2014, the Individual Defendants caused the Company to announce first quarter 2014 financial results.  On that date, the Individual Defendants caused 3D Systems to file with the SEC a Form 8-K attaching both a press release and a summary of results in advance of a conference call with analysts to discuss the Company's financial results.

68.     The April 29, 2014 press release stated:

ROCK HILL, S.C., April 29, 2014 (GLOBE NEWSWIRE) -- 3D Systems Corporation (NYSE:DDD) announced today that its first quarter revenue grew 45% from the prior year to $147.8 million on 28% overall organic growth, resulting in GAAP earnings of $0.05 per share and non-GAAP earnings of $0.15 per share for the first quarter.

"Our first quarter results reflect expanding demand across all of our revenue categories, led by strong 76% unit sales growth of design and manufacturing printers, and the ongoing placement of manufacturing printers that continued to increase the growth rate of materials," said Avi Reichental, 3DS' President and Chief Executive Officer.

**First Quarter 2014 Revenue Highlights** (compared to first quarter 2013):

- 3D printers and other products revenue increased 53% to $60.8 million.
- Print materials revenue grew 41% to $40.4 million.
- Services revenue rose 38% to $46.6 million.
- Healthcare revenue increased 53% to $21.7 million.
- Consumer revenue expanded 150% to $9.7 million.

The company exited the quarter with $28.8 million of backlog. The March 2014 backlog included $17.9 million of printer orders, in part reflecting increased demand for the company's Direct Metal 3D printers, which continues to outstrip manufacturing capacity.

Gross profit increased 41% and gross profit margin compressed 130 basis points to 51.1% compared to the first quarter of 2013 as printers growth continued to outpace other revenue categories, which contributed to GAAP net income of $4.9 million, and non-GAAP net income of $15.1 million.

"Consistent with our expectations, expanding placement and utilization of our advanced design and manufacturing 3D printers has accelerated our materials' revenue growth-rate, and we are pleased that our 3D printers growth continues to surpass all other product categories, despite the fact that the resulting mix delayed anticipated expansion of our gross profit margin," continued Reichental.

During the first quarter, the company continued to increase R&D investments and expand sales and marketing activities in support of accelerated growth, new product development and marketplace expansion, while also increasing its manufacturing capacity to accommodate rising demand.

At the same time, the company executed on acquisitions and strategic partnerships to broaden and enhance its 3D printing ecosystem, extending the 3D printing digital thread across its entire portfolio from consumer to healthcare to industrial manufacturing.

**Recent Business Highlights**

- In April, acquired Medical Modeling, a leading provider of FDA cleared, personalized surgical treatment planning and patient specific medical devices, to create the most comprehensive 3D printing medical devices capabilities
- Signed a definitive agreement to acquire Robtec to create a strategic Latin American sales and service platform, multiplex the company's reach and establish local presence
- Began R&D operations at acquired Wilsonville location, with a fully assembled team of 100 engineers, chemists and materials scientists using state of the art labs to support the accelerated development of next-generation products
- Advanced progress on continuous, fab-grade 3D printer platform and materials in support of Google's Project Ara phone commercialization and other advanced manufacturing opportunities
- Now powering the in-store 3D printing experience launched by Staples in New York and Los Angeles in April

Management continues to focus on accelerating the company's growth and expanding its market share, prioritizing initiatives and investments that are central to its plans to double revenue over the next couple of years. Management reiterates its 2014 guidance, expecting revenue to be in range of $680 million to $720 million and its GAAP earnings per share to be in the range of $0.44 to $0.56 and non-GAAP earnings per share to be in the range of $0.73 to $0.85.

Additionally, management expects a greater portion of revenue and earnings to be generated during the second half of 2014, as the full impact of its new products and services materializes.

"We believe that 3D Printing is on the cusp of accelerated design and manufacturing adoption, and the ultimate measure of our success will be the value we create from our market share and scale gains over time. While our stepped up strategy and investments continue to pressure our quarterly earnings, we believe that our actions set the stage to substantially compress the time required to deliver greater value. Accordingly, we expect operating leverage to resume in the second half of 2015 and be fully restored the following year," concluded Reichental.

69.     On the same day, the Individual Defendants caused the Company to file Form 10-Q with the SEC reporting the Company's financial results for the first quarter ending March 31, 2014.    The Form 10-Q confirmed the results reported in the April 29, 2014 press release.

70.     Defendants Reichental and Gregoire signed certifications pursuant to SOX stating they had reviewed the Form 10-Q and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" that report.

71.     Also, on the same date, the Individual Defendants hosted a conference call with securities analysts to discuss the Company's financial results.    On the call, Defendant Gregoire stated:

> We continue to focus on accelerating our – growing and expanding our market share, prioritizing our initiatives and investments that are central to our plans to double revenue over the next couple of years and to deliver the full potential of our business model. Accordingly, we expect our 2014 revenue to be in the range of $680 million to $720 million with greater growth during the second half of the year.

72. On the conference call, Defendant Reichental reassured investors that the Company's important Direct Metal manufacturing was continuing to expand, and that the Company's many acquisitions were helping to meet demand, stating:

> We continue to expand manufacturing capacity across our portfolio including accelerated expansion of our Direct Metals manufacturing as demand from industrial companies continues to outpace our capacity. Healthcare, it remains one of our fastest growing verticals as we continually focus on expanding our applications and reach. Inline with that in April, we acquired Medical Modeling, a leading provider of 3D printing enabled patient-specific medical devices and personalized surgical treatments including proprietary, virtual, surgical planning and clinical transfer tools.

73. These statements were false and misleading when made because (a) the Company's aggressive acquisition strategy acquisition strategy was affecting its manufacturing capacity; (b) the Company lacked reliable internal controls; (c) improper booking and shipping practices were leading to problems with inventory control; and (d) these issues would affect the Company's stated sales and revenue growth projections.

## VI. REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE IMPROPER

74. The true facts, which were known or were recklessly disregarded by the Individual Defendants during the Relevant Period but concealed from the investing public, were as follows:

a. The Company was having difficulty integrating the systems and operations of the many new companies that it had acquired through mergers. At the same time, the Individual Defendants were causing 3D Systems to introduce many new products all at the same time, leading to inefficiencies and reduced manufacturing capacity, and problems with booking, shipping, and inventory control;

b. Instead of revealing these issues to the public, the Individual Defendants were causing the Company to issue misleading statements touting increased revenues and

increased demand, and downplaying the inventory backlog and manufacturing inefficiencies;

c.       The aggressive acquisition strategy was diverting resources away from manufacturing capacity and the Company did not have adequate manufacturing capacity to produce important products, such as direct metal printers, at a level sufficient to meet consumer demand;

d.       Severe quality and manufacturing problems were delaying the release of important products such as direct metal printers, preventing the Company from capitalizing on demand;

e.       Lack of adequate internal controls were allowing improper sales practices, such as rushing to book and ship orders at the end of each quarter in order to boost revenue numbers, leading to increased costs due to incomplete shipments and improper payment arrangements; and

f.       As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

75.       As a result of the Individual Defendants' false and misleading statements and omissions, 3D Systems shares traded at artificially inflated prices during the Relevant Period. Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically, erasing more than a billion dollars in market capitalization.

## VII.   THE TRUTH EMERGES

76.       On July 31, 2014, after many months of misleading statements by the Individual Defendants to inflate the Company's stock price and conceal the true prospects for 3D Systems' growth projections, the truth finally began to emerge.   The Individual Defendants caused the

Company to issue a press release entitled "3D Systems Reports Second Quarter and Six Months 2014 Financial Results." The press release stated, in relevant part:

> ROCK HILL, S. C., July 31, 2014 (GLOBE NEWSWIRE) – 3D Systems Corporation (NYSE: DDD) announced today that its second quarter revenue grew $30.7 million, or 25%, from the prior year to $151.5 million on strong demand for its design and manufacturing printers, materials and services, resulting in second quarter GAAP earnings of $0.02 per share and non-GAAP earnings of $0.16 per share.
>
> Organic growth amounted to 10% as additional orders-in-hand, including $23.1 million of printer orders, a 29% sequential increase over the March backlog for printers, expanded the company's second quarter total backlog to a record $31.9 million.
>
> Gross profit margin shouldered the transitional effects of concentrated new product launches as well as the absorption of legacy products obsolescence and manufacturing expansion costs. Together, these factors and changed mix compressed gross profit margin some 400 basis points from the prior year's quarter to 47.8%.
>
> For the six months 2014, revenue grew $76.4 million, or 34%, with growth distributed broadly across all categories, to $299.3 million, resulting in GAAP earnings per share of $0.07 per share and non-GAAP earnings per share of $0.30 per share.

77. Although the press release tried to emphasize continued "strong demand" for the Company's products, the actual revenue of $151.5 million was far short of $162.3 million projections made by the Individual Defendants. Gross margins were only 47.8%, lower than the expected forecast of 51%. Similarly, the Company's organic growth was a disappointing 10%, compared with 30% in previous quarters.

78. On this news, the Company's stock dropped 11%, or $5.94 per share, to close at $50.13 per share, erasing nearly $653 million in market capitalization.

79. Despite the disappointing results, Defendant Reichental reassured investors in the July 31, 2014 press release, stating:

While transitional forces temporarily pressured our gross profit margin, a detailed examination of the specific drivers, confirms that the fundamentals of our business are intact and our gross profit margins are poised to rebound and resume their expansion trajectory…Consistent with our historical performance, we expect to generate a higher portion of our revenue during the second half on rebounding margins. Record bookings for our design and manufacturing printers together with rising orders for our consumer products provides us with confidence in our ability to achieve our 2014 guidance.

80. During the Company's conference call with analysts that same day, the Individual Defendants elaborated further on these "transitional forces." Specifically, Defendant Reichental explained:

Several factors contributed to the expansion of our order book; first, higher demand for our direct metal printers that continues to rise faster than we could add manufacturing capacity; second, booked orders for polymer printers that were scheduled for later deliveries by our customers; and finally, our decision to postpone shipments of new consumer product to improve user experience laid to an expanded backlog of our consumer orders. These factors shifted a portion of our organic bookings into future periods and temporarily suppressed our organic growth rate to 10% during the quarter.

81. Despite Reichental's reassurances, investors and analysts continued to question the true prospects for 3D Systems. An article in *Business Insider* titled "3D Systems Shares Are Cratering," stated:

Shares in 3D Systems were down more than 12% in pre-market trading Thursday after the firm reported earnings and revenue that fell short of expectations.

Q2 EPS came in at $0.16 a share versus forecasts for $0.18. Revenue hit $151.5 million against $162.3 million expected.

Inventory climbed to $90 million versus $86 million forecast, and gross margin came in at 47.8% versus 51% forecast.

CEO Avi Reichental said spending on new product launches held profits back this quarter but that underlying trends remained sound.

82. The Company's stock price continued to decline in the weeks and months that followed, but remained at artificially inflated prices due to the Individual Defendants' ongoing false and misleading statements.

83. On October 22, 2014, the Individual Defendants caused the Company to issue a press release announcing preliminary financial results for the third quarter 2014. In the press release, the Individual Defendants finally conceded that "[s]trengthening sales . . . were not enough to overcome the revenue shortfall from the continued manufacturing capacity constraints . . . ."

84. On this news, the price of 3D Systems stock sank another 15% in one day, declining $6.71 per share to close at $36.67 on October 22, 2014, erasing another $737.5 million in market capitalization.

85. Moreover, the Individual Defendants' announcement revealed that, contrary to their initial assurances, the weaknesses in the Company's operations continued and that, during the Relevant Period, projected growth figures had been artificially inflated as a result of 3D Systems' lack of adequate internal controls.

86. All told, 3D Systems saw its market capitalization shrink by **_billions of dollars_** during the Relevant Period between January 2014 and October 2014. The Company's stock price has continued its downward trajectory, closing at just $15.69 per share on August 10, 2016.

## VIII. THE COURT'S DENIAL OF THE MOTION TO DISMISS THE SECURITIES CLASS ACTION

87. In light of the above events, in April 2014, the Company became the subject of the Securities Class Action, which is pending in the U.S. District Court for the District of South Carolina. The amended complaint in the Securities Class Action, filed in November 2015, alleged violations of the federal securities laws, specifically Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 and was brought on behalf of a class consisting of "all persons or entities who purchased or acquired shares of 3D Systems (the "Class") between October 29, 2013 and May 5, 2015, inclusive."

88.     Significantly, all of the individual defendants to the Securities Class Action—Reichental, Gregoire, and Ted Hull—are defendants in the instant shareholder derivative action.

89.     On or about July 25, 2016, U.S. District Judge Mary G. Lewis ("Judge Lewis") issued an opinion denying the defendants' motion to dismiss the Securities Class Action.

90.     Notably, in her opinion denying defendants' motion to dismiss, Judge Lewis found, *inter alia*, that the amended complaint filed in the Securities Class Action "specifically identifies several alleged misrepresentations and omissions concerning 3D Systems' acquisition strategy, manufacturing capacity, product quality, sales and revenue growth projections, inventory control, and booking and shipping practices," and noted that the amended complaint also "sufficiently sets out the time, place and content of the statements . . . ." Judge Lewis also identified specific statements in the amended complaint that adequately alleged that "3D Systems experienced some operating inefficiencies related to the acquisition strategy and failed to disclose them to the market, all the while presenting little downside about the process."

91.     In addition, Judge Lewis found that the amended complaint in the Securities Class Action adequately pled other misrepresentations and omissions relevant to this shareholder derivative action, including "a misrepresentation by 3D Systems regarding the state of its inventory and failure to inform fully investors of its inventory-related difficulties," and statements by 3D Systems that "misrepresented the state of their product quality and customer reception to investors." Judge Lewis further found that "these alleged facts were material as they would have 'altered the 'total mix'' of information made available to investors."

92.     Of course, Judge Lewis denied defendants' motion to dismiss applying the significantly heightened pleading standards imposed upon plaintiff in the Securities Class Action by the Private Securities Litigation Reform Act of 1995.

93.     Thus, 3D Systems is now forced to spend millions of dollars defending the claims asserted in the Securities Class Action.   Nevertheless, the Board has yet to commence any litigation against any of the Defendants named in the Securities Class Action for the breaches of fiduciary duty and other violations of law alleged herein.

## IX.     INSIDER SELLING

94.     As noted above, not all shareholders were harmed by the Individual Defendants' actions.   Indeed, some of the Individual Defendants made illegal use of their insider knowledge of the false and misleading statements about the Company's business and prospects.

95.     Specifically, during the Relevant Period, while in possession of material, adverse, non-public information, Individual Defendants Reichental, Gregoire, Chuck Hull, Loewenbaum, and Moore—all fully aware of the unlawful basis driving the Company's stock to highly inflated levels—engaged in insider selling, collectively disposing of large amounts of their 3D Systems stock by unloading a staggering total of at least 567,979 shares of 3D Systems common stock for proceeds *exceeding $33 million*.

96.     Between November 2013 and July 2014, the Insider Selling Defendants sold Company stock at prices ranging between $48.40 per share to as high as $80.91 per share—far above the closing price of $36.67 per share that 3D Systems common stock sank to on October 22, 2014, when the truth regarding the Company's acquisition strategy, manufacturing capacity, product quality and growth projections began to be revealed, and far above the closing prices of $22.90 per share on May 6, 2015, or $9.01 on November 27, 2015.

97. Specifically, seeking to take advantage of the positive 2013 third quarter results, and subsequent uptick in the Company's stock price, several of the Individual Defendants—including certain of the Director Defendants—unloaded 3D Systems stock.

98. For example, on November 5, 2013—just a week after the Company's positive 2013 third quarter earnings announcement—Defendant Moore sold 15,000 shares at a price of $68.44 per share, for *total proceeds of $1,026,600*.

99. Less than a week later on November 11, 2013, Loewenbaum sold 80,000 shares of 3D Systems stock at prices between $76.25—$76.74 per share, for *total proceeds of over $6.1 million.*

100. A few days later on November 15, 2013, Gregoire sold 46,000 shares of 3D Systems stock at prices between $79.92—$80.81 per share, for *total proceeds of approximately $3.6 million*.

101. Each of these Individual Defendants also reaped additional profits by selling additional shares in 2014. Loewenbaum sold another 71,479 shares on March 5-6, 2014, for *almost $5.1 million in additional proceeds*. Gregoire sold 22,500 shares on May 7, 2014, 50,000 shares on August 27, 2014, and 45,000 shares on November 19, 2014, for a total of *approximately $5.3 million in additional proceeds.*

102. On December 13, 2013, shortly after the Company's stock reached the Relevant Period high, Reichental sold 25,000 shares of Company stock at $80.91 per share, for *total proceeds of $2,022,750*. Reichental made another large sale on March 14, 2014, just two weeks after the Company announced positive results for the fourth quarter and year ended 2014, and sold 66,700 shares of Company stock at $60.11 per share, for *total proceeds of $4,009,337*.

103. Later in the year, less than a month after the Company raised its guidance on July 31, 2014, Reichental reaped additional profits for himself, selling 52,300 shares of Company stock at $53.20 per share, for **total proceeds of $2,782,360**.

104. Defendant Chuck Hull also sold 95,000 shares of 3D Systems stock during the Relevant Period, for **total proceeds of $3,787,490.68**.

105. These insider sales were executed under highly suspicious circumstances and while the Insider Selling Defendants possessed material, adverse, non-public Company information, and were timed to coincide with the release of positive, reassuring news concerning the Company's business, finances, and prospects. Indeed, because of their roles as directors and/or officers of 3D Systems during the Relevant Period, Reichental, Gregoire, Chuck Hull, Loewenbaum, and Moore either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the business of 3D Systems, including, *inter alia*, that the Company's statements about 3D Systems' manufacturing capacity, product quality, and growth projections were false and misleading, and caused the price of its stock to trade at artificially inflated prices at the same time the Insider Selling Defendants were disposing of millions of dollars' worth of Company stock, in violation of the law and the Company's own insider trading policy..

106. Thus, the Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse non-public information concerning 3D Systems' business, finances, and prospects. In breach of these duties, the Insider Selling Defendants sold shares at artificially inflated prices, in order to reap personal profits.

# X. DUTIES OF THE INDIVIDUAL DEFENDANTS

## A. Fiduciary Duties

107. By reason of their positions as officers, directors, and/or fiduciaries of 3D Systems and because of their ability to control the business and corporate affairs of 3D Systems, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage 3D Systems in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of 3D Systems and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

108. Each director and officer of the Company owes to 3D Systems and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

109. The Individual Defendants, because of their positions of control and authority as directors and/or officers of 3D Systems, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with 3D Systems, each of the Individual Defendants had knowledge of material non-public information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

110.    To discharge their duties, the officers and directors of 3D Systems were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of 3D Systems were required to, among other things:

a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## B.    Audit Committee Duties

111.    In addition to these duties, the members of the Audit Committee owed specific duties to 3D Systems under the Audit Committee's Charter, including duties to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

112.    Specifically, according to the Company's Audit Committee Charter and Responsibilities Calendar, the Audit Committee has primary responsibilities to:

- Provide oversight of the independent auditor and resolve any disagreements between management of the Company and the independent auditor about financial reporting;

- Establish and oversee a policy designating permissible non-audit services that the independent auditor may perform for the Company and providing for pre-approval of those services by the Committee, subject to any de minimis exceptions permitted under applicable rules that the Committee approves;

- Review with management of the Company any significant changes to GAAP policies or standards;

- Participate (either the Chairman of the Committee and/or the Committee as a whole) in a telephonic meeting among management of the Company, the internal auditor and the independent auditor prior to each earnings release;

- Review the periodic reports of the Company with management of the Company, the internal auditor and the independent auditor prior to filing of the reports with the Securities and Exchange Commission;

- In connection with each periodic report of the Company, review:

a. Management's disclosure to the Committee and the independent auditor under Section 302 of the Sarbanes- Oxley Act

b. Any disclosure exceptions to the contents of the Chief Executive Officer's and the Chief Financial Officer's certificates to be filed under Sections 302 and 906 of the Sarbanes-Oxley Act;

- Review with the General Counsel legal and regulatory matters that may have a material impact on the financial statements, related Company compliance policies, and programs and reports received from regulators;

- Meet with the independent auditor in executive session to discuss any matters that the Committee or the independent auditor believes should be discussed privately with the Committee;

- Confirm periodically the independence of the independent auditor and periodically review the firm's non-audit services and related fees;

- Appoint and replace the independent auditor and approve the terms on which the independent auditor is engaged;

- Review the independence of each Committee member based on applicable statutes, regulations of the Securities and Exchange Commission, and listing standards of the New York Stock Exchange, Inc.;

- Verify that the Committee consists of a minimum of three members who are financially literate, including at least one member who has financial sophistication;

- Provide a report in the annual proxy that includes the Committee's review and discussion of matters with management and the independent auditor;

- As required by the Sarbanes-Oxley Act or other applicable rules or regulations, consider and review with management of the Company, the independent auditor and the internal auditor:

a. The Company's and the independent auditor's assessment of the effectiveness of its internal controls, including computerized information system controls and security.

b. Any related significant findings and recommendations of the independent public accountants and the internal auditor together with management's responses thereto;

- Review with management of the Company and the independent auditor at the completion of the annual audit:

a. The Company's annual financial statements and related footnotes.

b. The independent auditor's audit of the financial statements and its report thereon.

c. The independent auditor's report on internal controls.

d. Any significant changes required in the independent auditor's audit plan.

e. Any serious difficulties or disputes with management of the Company encountered during the course of the audit, including any restrictions on the scope of their work or access to required information.

f. Significant findings during the year and management's responses thereto.

g. Other matters related to the conduct of the audit which are to be communicated to the Committee under generally accepted auditing standards;

- Review with management of the Company and the independent auditor at least periodically the Company's critical accounting policies;

- Review with the internal auditor, the independent auditor and management of the Company the audit scope and plan, and coordination of audit efforts to assure completeness of coverage, reduction of redundant efforts, the effective use of audit resources, and the use of independent public accountants other than the appointed auditors of the Company;

- Review disclosure in the Company's financial statements and periodic reports of transactions between the Company and officers and directors, or

affiliates of officers or directors, or transactions that are not a normal part of the Company's business;

- Develop and oversee procedures for (i) receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, and (ii) the confidential, anonymous submission of employee concerns regarding accounting or auditing matters;

- Review with management of the Company at least periodically the Company's principal financial policies;

- Conduct or authorize investigations into any matters within the Committee's scope of responsibilities;

- Prepare an agenda for Committee meetings in consultation between the Committee chair (with input from the Committee members), management of the Company, the internal auditor and the independent auditor;

- Meet quarterly or more frequently as circumstances require. The Committee may ask members of management or others to attend the meeting and provide pertinent information as necessary;

- Provide an open avenue of communication between the internal auditor, the independent auditor, management of the Company and the Board;

- Review and update the Committee Charter and Responsibilities Calendar as circumstances warrant;

- Review and approve the appointment or change in the internal auditor;

- Inquire of management of the Company, the internal auditor, and the independent auditor about significant risks or exposures and assess the steps management has taken to minimize such risk to the Company;

- Meet with management of the Company in executive sessions to discuss any matters that the Committee or management believes should be discussed privately with the Committee;

- Evaluate the Committee's performance and Charter at least annually, and recommend to the Board such modifications to the Charter, the membership of the Committee and its procedures as the Committee deems necessary or appropriate;

- Obtain advice and assistance from internal or outside legal, accounting or other advisors at the expense of the Company, as it deems appropriate to assist it in performing its functions;

- Make reports to the Board at its next regularly scheduled meeting as appropriate following meetings of the Committee, accompanied by any recommendations to the Board; and

- Perform such other functions within the scope of the foregoing which the Committee deems appropriate to undertake from time to time.

113. Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

## C. Control, Access, and Authority

114. The Individual Defendants, because of their positions of control and authority as directors and/or officers of 3D Systems, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by 3D Systems.

115. Because of their advisory, executive, managerial, and directorial positions with 3D Systems, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of 3D Systems.

116. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of 3D Systems, and was at all times acting within the course and scope of such agency.

## D. Reasonable and Prudent Supervision

117. To discharge their duties, the officers and directors of 3D Systems were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of 3D Systems were required to, among other things:

a.　　ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b.　　conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.　　properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

d.　　remain informed as to how 3D Systems conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

e.　　refrain from trading on material, adverse, non-public information; and

f.　　ensure that 3D Systems was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## XI.　BREACHES OF DUTIES

118.　Each Individual Defendant, by virtue of his position as a director and/or officer, owed to 3D Systems and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of 3D Systems, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of 3D Systems, the absence of good faith on their part, and a reckless disregard for their duties to 3D Systems and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to 3D Systems.

119.    The Individual Defendants each breached their duties of loyalty and good faith by issuing or by causing the Company to issue false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

## XII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

120.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

121.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

122.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

123.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or

negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

124. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## XIII. DAMAGES TO 3D SYSTEMS

125. As a result of the Individual Defendants' wrongful conduct, 3D Systems disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated 3D Systems' credibility. Additionally, 3D Systems is the subject of the Securities Class Action, which is now proceeding towards trial. 3D Systems has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

126. As a direct and proximate result of the Individual Defendants' actions as alleged above, the Company's market capitalization has been substantially damaged, losing billions of dollars in value as a result of the conduct described herein.

127. Further, as a direct and proximate result of the Individual Defendants' conduct, 3D Systems has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

a. costs incurred in investigating and defending 3D Systems and certain officers in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

b. costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on the Company's artificially inflated stock price;

c. costs incurred from the misappropriation of Company information by the Insider Selling Defendants for the purpose of selling 3D Systems common stock at artificially inflated prices; and

d. costs incurred from the loss of the Company's customers' confidence in 3D Systems and its products.

128. Moreover, these actions have irreparably damaged the Company's corporate image and goodwill. For at least the foreseeable future, 3D Systems will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired. 3D Systems has also suffered a loss of *billions of dollars in market capitalization* as a direct result of the Individual Defendants' wrongdoing alleged herein.

## XIV. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

129. Plaintiff brings this action derivatively in the right and for the benefit of 3D Systems to redress injuries suffered, and to be suffered, by 3D Systems as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law. 3D Systems is named as a nominal defendant solely in a derivative capacity.

130. Plaintiff will adequately and fairly represent the interests of 3D Systems in enforcing and prosecuting its rights.

131. Plaintiff has continuously been a 3D Systems shareholder at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein. Specifically, Plaintiff has continuously been a shareholder of 3D Systems since January 2013.

132. Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

133. Plaintiff has not made any demand on shareholders of 3D Systems to institute this action since such demand would be a futile and useless act for the following reasons:

    a. 3D Systems is a publicly traded company with thousands of shareholders of record;

    b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of 3D Systems shareholders; and

    c. Making demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

134. The Company has been directly and substantially injured by reason of the Individual Defendants' breaches of their fiduciary duties to 3D Systems. Plaintiff, as a shareholder of 3D Systems, seeks damages and other relief on behalf of the Company, in an amount to be proven at trial.

135. At the time this action was commenced, the Board of 3D Systems consisted of the following nine (9) directors: Director Defendants Chuck Hull, Curran, Humes, Kever,

Loewenbaum, Moore, Van Riper, and Welke, and non-defendant Thomas W. Erickson ("Erickson").[2]

## A.  Director Interestedness Based on Challenged Insider Sales

136.  During the Relevant Period, some of the Director Defendants—Chuck Hull, Loewenbaum, and Moore—illicitly sold shares of their personal 3D Systems stock while in possession of material, adverse, non-public information, during a time in which 3D Systems stock was artificially inflated due to the Individual Defendants' misconduct.  Moreover, in making or causing these sales, Chuck Hull, Loewenbaum, and Moore violated the Company's insider trading policy.

137.  As a result of these illicit insider sales, defendants Chuck Hull, Loewenbaum, and Moore each received direct financial benefits not shared with 3D Systems shareholders, and are, therefore, each directly interested in a demand.  Further, defendants Chuck Hull, Loewenbaum, and Moore each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.  Accordingly, demand upon Chuck Hull, Loewenbaum, and Moore is futile.

## B.  Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability in Connection with the Company's Pervasive Misconduct

138.  The Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith and other misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such had fiduciary duties to ensure the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

---

[2] Erickson was appointed to the Board on November 17, 2015.

139.     Indeed, the Director Defendants were responsible for reviewing and approving the Company's financial statements.     By authorizing the false financial statements and public statements alleged herein which were made beginning in October 2013, by signing the fiscal 2013 Form 10-K filed with the SEC during the Relevant Period, and by failing to correct other statements which the Officer Defendants made during such time, the Director Defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to lawsuits claiming violations of the federal securities laws.     A director's breach of the duty of candor is not entitled to protection under the business judgment rule.     As a result, any demand upon the Director Defendants to bring suit against themselves or the Officer Defendants would be a useless and futile act.

140.     The Director Defendants caused and/or allowed the Company to engage in deliberately issuing false and misleading statements to mislead investors, and each of the Director Defendants face a substantial likelihood of liability for causing 3D Systems to engage in such *illegal and unlawful conduct*.     As is described above, the Director Defendants either knew and caused, or were reckless in not knowing, that the Company was unable to operate its manufacturing facilities in order to meet customer demand or to obtain projected revenues.     The business judgment rule protects a wide variety of business decisions, but does not protect a corporation's officers and directors from causing a company to engage in illegal and unlawful conduct.

141.     As a result of the alleged misconduct described above, defendants Chuck Hull, Curran, Humes, Kever, Loewenbaum, Moore, Van Riper, and Welke (*i.e.* the vast majority of the Board) face a substantial likelihood of liability for their breaches of fiduciary duties, rendering

any demand upon them futile. Moreover, this conduct is not entitled to the protections of the business judgment rule, which also independently excuses demand.

142. Additionally, the Director Defendants were specifically responsible for ensuring 3D Systems had adequate internal controls regarding the Company's compliance with federal and state rules and regulations regarding its business practices. Thus, the Director Defendants are directly responsible for 3D Systems' failure to adopt and implement such internal controls, and for the substantial damages 3D Systems is subject to in the ongoing lawsuits. As such, all the Director Defendants face a substantial likelihood of liability for the claims asserted herein. Demand is therefore futile.

143. Further, Defendants Chuck Hull, Curran, Humes, Kever, Loewenbaum, Moore, Van Riper, and Welke (*i.e.* the vast majority of the Board) each signed the false and misleading fiscal 2013 Form 10-K. The fiscal 2013 Form 10-K was false and misleading because (among other things) it touted increased revenues based on increased manufacturing and sales, which the Director Defendants either knew, or were reckless in not knowing, statements, when made, were materially false and misleading or omitted material facts to make such statements not false and misleading. As a result, defendants Chuck Hull, Curran, Humes, Kever, Loewenbaum, Moore, Van Riper, and Welke (*i.e.* the vast majority of the Board) face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.

144. Indeed, the Director Defendants, knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements, throughout the Relevant Period, that caused the Company's stock to trade at artificially inflated prices.

145.     Moreover, the Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors. The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

146.     The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of 3D Systems to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

## C.     Demand is Futile as to the Audit Committee Defendants

147.     During the Relevant Period, Defendants Curran, Moore, and Van Riper served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were specifically responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing the Company's internal controls over financial reporting, and discharging their other duties described herein. Despite these duties, the Audit Committee Defendants knowingly or recklessly

reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and/or materially misleading earnings press releases and quarterly and annual financial statements, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

## D.      Demand is Futile as to Erickson

148.    Demand is futile as to Erickson because Erickson is not an independent director.

149.    According to the Company's most recent Proxy (the "2016 Proxy") filed with the SEC on March 25, 2016 and disseminated to shareholders, Erickson was appointed as a director of the Company on November 17, 2015. Erickson received $29,952 in total compensation from 3D Systems in 2015. As explained in the 2016 Proxy, the Board approved a consulting agreement (the "Erickson Consulting Agreement") between the Company and ECG Ventures, Inc., a consulting company owned by Erickson, on January 21, 2016. The Erickson Consulting Agreement provides that Erickson "will provide strategic and management consulting services to the Company in exchange for $75,000 a month plus reimbursement of expenses," and Erickson was also awarded 25,000 shares of restricted stock with a vesting date of December 31, 2016.

150.    Thus, Erickson cannot independently consider any demand as he is not an independent director and would not jeopardize his consulting arrangement by pursuing claims against those in control of his appointment, rendering demand futile upon Erickson.

## E.    Demand is Futile as to Chuck Hull for Additional Reasons

151.    Aside from the reasons already discussed herein, demand is also futile as to Chuck Hull because Chuck Hull is not an independent director.

152.    Specifically, according to the 2016 Proxy, Chuck Hull is one of the founders of the Company and serves as its Chief Technology Officer and is thus an executive officer of the Company.

153.    Indeed, Chuck Hull received $2,803,363 in total compensation from 3D Systems in 2013, $1,882,504 in total compensation from 3D Systems in 2014, and $974,087 in total compensation from 3D Systems in 2015.

154.    Additionally, the Company entered into a lucrative consulting arrangement with Chuck Hull which will take effect at the time of his retirement from 3D Systems, pursuant to which the Company will pay him a compensation package totaling $695,153, including a consulting fee paid over four years in a total amount of $525,000, and continuing coverage for life, dental, vision, and health insurance.

155.    Finally, the 2016 Proxy admits that Chuck Hull is not an independent director.

156.    Thus, Chuck Hull cannot independently consider any demand as he is not an independent director and would not jeopardize his current employment with the Company or his lucrative post-retirement consulting arrangement by pursuing claims against those responsible for providing him with such lucrative post-retirement benefits, rendering demand futile upon Chuck Hull.

157.    Thus, demand is futile as to defendants Chuck Hull, Curran, Humes, Kever, Loewenbaum, Moore, Van Riper, and Welke and non-defendant Erickson.

# COUNT I

## Against the Individual Defendants for Breaches of Fiduciary Duties

158. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159. The Individual Defendants owed and owe 3D Systems fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe 3D Systems the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

160. In addition, the Individual Defendants had a duty to act in the best interests of the Company and its shareholders and not to act in furtherance of their own self-interests.

161. As alleged in detail herein, each of the Individual Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that 3D Systems disseminated accurate, truthful, and complete information to its shareholders.

162. The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

163. The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

164. Additionally, as is also alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

165.    As executive officers of 3D Systems and members of the 3D Systems Board, the Individual Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the law as alleged herein. Each of them had knowledge of and actively participated in, and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings.   The alleged acts of wrongdoing have subjected 3D Systems to unreasonable risks of loss and expenses.

166.    Yet, the Individual Defendants willfully ignored the obvious and pervasive problems with 3D Systems' manufacturing capacity, product quality, growth projections, and internal control practices and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

167.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, 3D Systems has sustained significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.    By reason of the foregoing, 3D Systems was damaged.

169.    Plaintiff, on behalf of 3D Systems, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

170.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of 3D Systems.

172.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to 3D Systems.

173. Further, the Insider Selling Defendants sold 3D Systems common stock (or caused it to be sold for their benefit) while in possession of material, adverse non-public information that artificially inflated the price of 3D Systems stock. As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

174. Plaintiff, as a shareholder and representative of 3D Systems, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

175. By reason of the foregoing, 3D Systems was damaged.

176. Plaintiff, on behalf of 3D Systems, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

177. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of 3D Systems' internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and on-going harm to the Company.

179. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and

directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

180. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

181. By reason of the foregoing, 3D Systems was damaged.

182. Plaintiff, on behalf of 3D Systems, has no adequate remedy at law.

## COUNT IV

**Against the Insider Selling Defendants for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**

183. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184. At the time the Insider Selling Defendants sold their 3D Systems stock, they knew the information described herein, and sold 3D Systems stock on the basis of such information.

185. The information described herein was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold 3D Systems stock.

186. At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition and future business prospects, specifically related to, among other things, the Company's manufacturing capacity, product quality, sales and revenue growth projections, inventory control, booking and shipping practices, and lack of internal controls.

187. The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

188. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

189. By reason of the foregoing, 3D Systems was damaged.

190. Plaintiff, on behalf of 3D Systems, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongdoing as alleged herein;

B. Directing 3D Systems to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect 3D Systems and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of 3D Systems directors, executives, and other employees;

- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of 3D Systems to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C.      Awarding to 3D Systems restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: August 12, 2016

**HOPKINS LAW FIRM, LLC**

*s/J. Clay Hopkins*

J. CLAY HOPKINS (Fed. ID #12147)
WILLIAM E. HOPKINS, JR (Fed. ID #6075)
clay@hopkinsfirm.com
bill@hopkinsfirm.com
12019 Ocean Highway
P.O. Box 1885
Pawleys Island, SC 29585
Telephone: (843) 314-4202
Facsimile: (843) 314-9365

JOHNSON & WEAVER, LLP
Frank J. Johnson
frankj@johnsonandweaver.com
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

JOHNSON & WEAVER, LLP
Michael I. Fistel, Jr.
michaelf@johnsonandweaver.com
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101

Attorneys for Plaintiff
DAVE HOWES